JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jayme Reed, Individually and on behalf of all others similarly situated

## DEFENDANTS

Valve Corporation
CSGO Lotto, Inc.

**(b)** County of Residence of First Listed Plaintiff   Passaic County, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   King County, WA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

James A. Barry, Locks Law Firm, LLC, 801 N. Kings Highway
Cherry Hill, NJ 08034 Tel. 856-663-8200

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 830 Patent | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

Additional OTHER STATUTES entries:
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 USC § 1962, N.J. Stat. Ann. §56:8-1, et seq., N.J. Stat. Ann. §2C:41-1, et. seq.

Brief description of cause:
Violation of Federal RICO statute and state consumer protection, deception, and truth in advertising statutes

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
7/7/2016

SIGNATURE OF ATTORNEY OF RECORD
s/ James A. Barry

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK VICINAGE

| | |
|---|---|
| **Jayme Reed,** Individually And On Behalf of All Others Similarly Situated,<br><br>                                       **PLAINTIFF,**<br><br>              **vs.**<br><br>**VALVE CORPORATION**<br>a Washington corporation,<br><br>**CSGOLOTTO INC.**<br>a Florida corporation,<br><br>**TREVOR A. MARTIN,**<br>a Florida individual, and<br><br>**THOMAS CASSELL,**<br>a California individual.<br><br><br>                          **DEFENDANTS** | **Civil Action No.**<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jayme Reed ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel, brings this action against Valve Corporation, CSGOLotto, Inc., Trevor A. Martin, and Thomas Cassell, and states as follows:

## NATURE OF THE CASE

1.      Competitive video gaming is a multi-billion dollar business. The industry is similar to other major sports like football, basketball and baseball, and is generally called eSports. And just like major sports, eSports has its own professional players, organized leagues

and even weekly nationally televised contests on the cable station TBS[1], all sponsored by major corporate advertising with national brands like Buffalo Wild Wings and Arby's.[2]

2.      Just like traditional sports, eSports has become the subject of gambling and wagering on outcomes of matches between professional teams.  An estimated $2.3 billion was wagered on eSports in 2015 by more than 3 million people.[3]  Like traditional sports, the vast majority of this wagering takes place through an unregulated economy on websites mostly based outside of the United States.  However, unlike traditional sports, the people gambling on eSports are mostly teenagers.[4]  Also unlike traditional sports, the company that makes the product being wagered on is directly profiting from that wagering.[5]

3.      Defendant Valve Corporation ("Valve"), headquartered in Bellevue, Washington, owns the sports league product and is a key component in the online gaming marketplace through its Steam platform.  Valve has knowingly[6] allowed an illegal online gambling market and has been complicit in creating, sustaining and facilitating that market.  Throughout this Complaint, Steam and Valve are used interchangeably.

4.      Valve does this through its e-gaming phenomenon product Counter-Strike: Global Offensive ("CS:GO" or "Counter-Strike"). More than 380,000 people are playing Counter-Strike worldwide at any given time.[7] CS:GO is the subject of TBS weekly e-gaming matches, and is the main driver of the pro-gaming cultural phenomenon. CS:GO matches are streamed live on websites like Twitch in addition to the TBS weekly league show.

---

[1] http://www.e-league.com/teams/
[2] http://www.e-league.com/news/official-marketing-partners
[3] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[4] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[5] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[6] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/
[7] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

5.      Defendant Valve knowingly[8] allowed, supported, and/or sponsored illegal gambling by allowing millions of Americans to link their individual Steam accounts to third-party websites, of which there are hundreds, such as CSGO Lounge ("Lounge"), CSGO Fast ("Fast"), CSGO Diamonds ("Diamonds"), CSGOSpeed ("Speed"), CSGOShuffle ("Shuffle"), CSGOJackpot ("Jackpot"), and OPSkins (collectively, "unnamed co-conspirators") and by allowing third party sites to operate their gambling transactions within the Steam marketplace. Lounge, Fast, Diamonds, Speed, Shuffle and Jackpot are collectively referred to as "Skins Gambling Websites" hereafter.

6.      Counter-Strike players can purchase CS:GO Skins ("Skins"), weapons with different textures that can be used during gameplay of Counter-Strike, through Steam, Valve's online marketplace. Skins can then easily be traded and used as collateral for bets placed on Skins Gambling Websites through linked Steam accounts. In the eSports gambling economy, skins are like casino chips that have monetary value outside the game itself because of the ability to convert them directly into cash.  Valve takes a 15% fee on the sale of each Skin (casino chip) through its marketplace.[9]

7.      Unlike traditional casino chips, however, Valve has created Skins out of thin air and can therefore control the ultimate real world value of these items through its control over supply in the marketplace.[10]  And, unlike a traditional casino, Valve does not risk anything by selling these Skins and does not allow users to directly exchange these for cash, and only makes a fee from selling them.

8.      Diamonds allows users to exchange Skins for virtual diamonds, which then can be used to wager on variable-odds outcomes based on dice rolling. Diamonds claims on its website

---

[8] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/
[9] https://support.steampowered.com/kb_article.php?ref=6088-UDXM-7214
[10] http://store.steampowered.com/news/19618/

that it offers an innovative new way to bet Skins and that it caters to all styles of gambling. One diamond is equivalent to approximately $1 in Skins. Diamonds claims that its methods are provably fair and that diamonds earned are able to be converted to real currency. Diamonds can also be used to repurchase Skins, with the price of skins valued according to CS:GO Analysts, which are based on the economic theory of supply and demand. Moreover, Diamonds pays users to promote its website. Diamonds has no age verification process in place, which allows minor users to place illegal bets that can later be converted to real currency on other third-party websites.

9.     Lounge is a third-party site that allows users to place bets on professional Counter-Strike matches. Users simply link their Steam accounts via a sponsored Valve link on Lounge's site. Users can bet up to six Skins on any given match. Users can then collect their winning Skins and sell them for real currency on third-party sites, such as OPSkins, or place additional bets on upcoming professional Counter-Strike matches. Defendant Valve knowingly allows Lounge to provide links to Valve's Steam marketplace.  Valve knowingly allows and facilitates Lounge having multiple accounts on the Valve Marketplace to facilitate the gambling transactions, and provides support and easy access for Lounge to create and manage these accounts.  Valve knows[11] Lounge is operating a skins gambling website.  Lounge has no age verification process in place, which allows minor users to place illegal bets.   Upon information and belief, Valve has an ownership interest in and/or directly profits from the gambling of Skins on Lounge.

10.     Defendant CSGOLotto, Inc. ("Lotto") is a third-party site that allows users — including but not limited to Plaintiff — to place bets on various casino-style games, lotteries, jackpots, and other ways to gamble skins as if they were casino chips, sometimes against the site

---

[11] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

4

itself, and sometimes against other players.  Similar third-party sites also include Speed, Crash, and Arena. Users have to login to each of these accounts through their Steam account, trade their skins to the site's own steam accounts or steam account bots on the Steam Marketplace, and then receive skins back through the Steam Marketplace. Defendant Valve knowingly[12] allows Speed, Crash, Lotto and Arena to have accounts on Steam's Marketplace, use Steam's software to login to users' Steam accounts, access information on Steam's servers, and provide links to Steam's marketplace.  Valve knows these websites are used for gambling of items with real world cash value and affirmatively allows this gambling.

11.     Defendants Trevor A. Martin and Thomas Cassell are the owners of Lotto, and they actively promote Lotto as a gambling service, including to minors.

12.     Fast, Shuffle, and Jackpot are third-party sites that allow users to place bets on various casino-style games, lotteries, jackpots, and other ways to gamble skins as if they were casino chips, sometimes against the site itself, and sometimes against other players.  Users have to login to each of these accounts through their Steam account, trade their skins to the site's own steam accounts or steam account bots on the Steam Marketplace, and then receive skins back through the Steam Marketplace. Defendant Valve knowingly[13] allows Fast, Shuffle, and Jackpot to have accounts on Steam's Marketplace, use Steam's software to login to users' Steam accounts, access information on Steam's servers, and provide links to Steam's marketplace. Valve knows these websites are used for gambling of items with real world cash value and affirmatively allows this gambling.

---

[12] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/
[13] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

13.     OPSkins is a third-party Skins marketplace website that allows a user to link their individual Steam account and sell Skins for real currency. Valve knowingly[14] allowed OPSkins to provide links to Valve's Steam marketplace and allows OPSkins to have multiple accounts on the Steam Marketplace to facilitate the cashing out of Skins for real money, and provides support and easy access for OPSkins to create and manage these accounts.  Valve knows OPSkins is operating a skins gambling and cash marketplace website. OPSKins allows users to get same day cash for their Skins via PayPal. OPSkins charges a 5% fee for same day cash outs. OPSkins partners with CS:GO Analyst in order to assign value to various Skins. The value of Skins can fluctuate hourly based on the economic theory of supply and demand.

14.     In sum, Valve owns the league, sells the casino chips for a fee, and receives a piece of the income stream through foreign websites in order to maintain the charade that Valve is not promoting and profiting from online gambling, like a modern-day Captain Renault from Casablanca[15].

15.     To put it another way, Valve is the barkeeper who allows illegal gambling operators to set up shop in its backroom and sell chips for a fee to customers on their way in, but claims it is powerless to stop the illegal gambling racket and benefits from having a packed house every night.  The value of Skins has gone up because of the gambling marketplace Valve created, sustains and supports, and Valve has directly profited from the sale of Skins, in addition to third-party business ventures such as a league based on CS:GO.  That most of the people in the CS:GO gambling economy are teenagers and/or under 21 makes Valve's and the other unnamed co-conspirators' actions even more unconscionable.

---

[14] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/
[15] https://www.youtube.com/watch?v=qmywwiZth5E

## PARTIES, JURISDICTION AND VENUE

16.     Defendant Valve is a Washington Corporation headquartered at 10900 NE 4th St., Suite 500, Bellevue, Washington 98004. Valve is authorized to conduct business and does conduct business throughout the State of New Jersey.  Valve is the publisher and developer of the videogame Counter Strike: Global Offensive.

17.     Defendant CSGOLotto ("Lotto") is a Florida corporation, headquartered at 6511 Vineland Drive, Orlando, Florida 32819, and owned in part by Defendants Trevor A. Martin and Thomas Cassell.

18.     Defendant Trevor A. Martin ("Martin") is a Florida citizen and a resident of Orlando, Florida, who also is co-owner, President and Registered Agent for Lotto.

19.     Defendant Thomas Cassell ("Cassell") is a California citizen who resides in Los Angeles, California, who also is co-owner and Vice President of Lotto.

20.     Plaintiff Jayme Reed is a resident and citizen of Passaic County, New Jersey, and has been a customer of Valve since 2012.  He is an online player of CS:GO and has entered into wagering, including on Lotto. Specifically, Plaintiff won CS:GO from a giveaway contest on Twitch involving another gamer, purchased numerous Skins (totaling approximately $3,000 in cash value), gambled them and lost money, and knew that he could cash out the value of the Skins for real money prior to losing them while gambling.

21.     This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one of Plaintiff's civil claims arises under the Constitution, laws or treaties of the United States, specifically, violation of 18 U.S.C. § 1962.

7

22.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims in which the Court has original jurisdiction that they form part of the same case or controversy.

23.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 as a substantial portion of the events and conduct giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

**A.     The Rise Of E-Sports and CS:GO**

24.   Valve has manufactured video games for nearly 20 years.  In 1999, it introduced the Counter-Strike series, culminating in CS:GO's release in 2012.

25.   CS:GO was one of many similar video games involving players who play as either terrorists or counter-terrorists.  Because the player views the video game through the eyes of a character and shoots guns, it is known as a "first person shooter" game.  When CS:GO was released in 2012, the market was flooded with such franchise as Call of Duty, Halo and Battlefield.

26.   Seeking to differentiate itself, CS:GO introduced Skins.  The announcement made was August 14, 2013 through an announcement posted on its website titled "The Arms Deal Update" ("Skins Announcement").[16]

27.   The Skins Announcement told players that they could "experience all the illicit thrills of black market weapons trafficking without any of the hanging around in darkened warehouses getting knifed to death."  Specifically, "[t]he Arms Deal Update lets you collect, buy, sell and trade over 100 all-new decorated weapons that you can equip in-game."

28.   The Skins Announcement discussed how the new marketplace would work: "You can start collecting decorated weapons via timed weapon drops just by playing CS:GO on

---

[16] http://blog.counter-strike.net/index.php/2013/08/7425/

official and community servers. You can also get them by opening dropped weapon cases with the appropriate key, or by trading with other players through Steam's Trading interface. Additionally, any decorated weapons you've found, bought or traded can be sold on the Steam Marketplace."

29.    Valve directed players to Reddit (the "front page of the internet" forum website with numerous sub-forums for specific interests), the Steam Community Discussions and the CS:GO Forums on steampowered.com for more information and to discuss Skins.

30.    Steam and steampowered.com are wholly owned properties of Valve. Steam operates as a wholly enclosed ecosystem wherein players can play games, communicate with other players, initiate trades with other players, list items for sale, buy games, buy items, deposit money into their "Steam Wallet," participate in forum discussions, and communicate with Valve directly.

31.    When items are bought and sold on the Steam Marketplace, Valve Steam takes a 5% cut on all total sales, and an additional percentage depending on the game the item is related to. If a sale is related to CS:GO, Steam takes an additional 10%, resulting in a 15% fee in all marketplace sales related to CS:GO.

32.    The creation of Skins was a deliberate attempt by Valve to increase its sales and profits by adding an element of gambling and market economies to its products. And it worked: as a result of the gambling ecosystem, explained in depth below, that grew up around CS:GO Skins, the number of players on CS:GO increased more than 1,500 percent, and CS:GO became the subject of televised and monetized eSports. Despite its slow initial sales, Valve has now sold more than 21 million copies of CS:GO, earned more than $567 million in total revenue from

sales of CS:GO alone, and earned a percentage of gambling proceeds on CS:GO through various websites and third parties.[17]

33.     This was a deliberate strategy on Valve's part.  One of its employees explained at a developer's conference in 2014 that the company determined that the "best way to get players deeply engaged in games...was to give away virtual items of random value and encourage a robust market to trade them."  That employee was quoted as saying: "This is not an accident. This is by design.  We see more blogs popping up and more and more emails from our players saying, 'I'm not really sure what happened but I've been playing DotA for the last week or two, and I made $100 selling these items that I got.'  This is hugely successful for us."[18]  "DotA" refers to Defense of the Ancients, another Valve game with a similar Skin gambling ecosystem like CS:GO.

34.     Valve went so far as to hire an internationally renowned economist to help it develop currencies and cross-platform economies.[19]

35.     The results were stunning: in addition to TBS broadcasting video games on television, eSports matches have sold out arenas, are watched by tens of millions of viewers online and created a multi-billion dollar global gambling marketplace.

36.     There is an increase in betting - and therefore the purchase of Skins on Valve's website - during televised eSports.  Since TBS debuted CS:GO matches, as many as 3.38 million skins were bet on matches on Lounge.  The average value of Skins traded across various platforms was $9.75.  The total "handle" - that is, dollars wagered - is more than $33 million. The matches televised in TBS result in the highest amount of wagering.[20]

---

[17] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[18] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[19] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[20] http://www.esportsbettingreport.com/eleague-handle-for-skin-betting/

37.     Valve receives a direct financial benefit from televised CS:GO matches.

38.     The online gambling ecosystem around CS:GO is illegal in the United States.

39.     Valve had no license, permission or legal authority to create, sustain, profit from or otherwise support an online gambling platform, and, as discussed more in depth below, Valve's affirmative actions both created this online gambling system and allow it to continue.

### B.     The Mechanics of Gambling On CS:GO And How Valve Has Created, Facilitated, Fostered and Affirmatively Allowed Skins Gambling

40.     Valve sells Skins through its website and Steam platform.  Valve takes a 15% fee on all CS:GO Skins sold through its website or sold on its Marketplace.

41.     These Skins can be won, bought, traded, sold, and otherwise have in-game value through Steam's marketplace and the CS:GO game itself.  It also sells versions of Skins called Knives using the same system.[21]

42.     Unlike apps and other computer games with such in-game purchases, Valve has created and currently supports a secondary marketplace where these in-game purchases can be gambled and cashed out.

43.     Skins, in gambling terms, can be seen as casino chips.

44.     CS:GO matches happen all day every day, and at any given time there are as many as 380,000 people playing CS:GO online.[22]

45.     In addition to the TBS-televised games, there are online broadcasts on websites such as Twitch.  In any given match, viewers may pick which team they think is going to win. The people who bet on the outcome of the eSports match do not play in it and have no control over the outcome.

---

[21] http://www.pcgamer.com/how-400-virtual-knives-saved-counter-strike/2/
[22] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

46.    "People buy skins for cash, then use the skins to place online bets on pro CS:GO matches.  Because there's a liquid market to convert each gun or knife back into cash, laying a bet in skins is essentially the same as betting with real money."[23]

47.    Players must link their Steam account to third party websites such as OPSkins and Skins Gambling Websites in order to be able to gamble or cash out their Skins on the third-party sites.

48.    OPSkins and Skins Gambling Websites such as Lotto have their own accounts on the Steam marketplace that are used to facilitate transfers, sales and gambling.  That is, if a user logs into a Skins Gambling Website and wants to gamble, technically they transfer their skins to the Skins Gambling Website's own Steam account, or one of that Skins Gambling Website's numerous "bot" accounts.  If the user wins, the Skins Gambling Website transfers those Skins back to the user's Steam account.  OPSkins does the same and has numerous Steam accounts of its own to facilitate users turning Skins into cash.

49.    These third party websites require permission and cooperation from Valve in order to access a player's account on Steam, and Valve specifically allows players to transfer skins to third-party accounts on the Steam Marketplace. Valve allows this knowing exactly what these sites' accounts are, what users are doing, and is affirmatively supporting these transactions, and receiving income from transactions on these sites.  "The gambling sites run on software built by Valve, and whenever CS:GO skins are sold, the game maker collects 15 percent of the money."[24]

50.    Upon information and belief, Valve has an ownership interest, partnership or otherwise a direct business relationship with Lounge.

---

[23] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[24] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/

51.     Valve has helped develop the gambling economy and third-party sites and has worked with the third-party sites such as Lotto to continue operations.  Valve affirmatively facilitates the gambling through allowing third-parties to create thousands of accounts through automation, "whitelists" or other shortcuts, and knowingly allows these steps of the gambling process to occur within the Steam marketplace.

52.     For instance, in January 2015, Valve instituted a new security measure that required users to prove they were real human beings known as a "Captcha" tool.  Valve did this in order to "prevent malware on users' machines making trades on their behalf."  However, Valve specifically "excluded a few of the existing third-party trading services from this requirement so they can continue to function."[25]  Those third-party trading services are sites like OPSkins and the Skins Gambling Websites that use hundreds and/or thousands of Steam accounts to facilitate gambling.[26]

53.     Valve is well aware of the Skins gambling that goes on, is well aware that Skins have real world cash value, which has increased their popularity and value, and actively encourages and facilitates Skins gambling.

54.     Valve is aware that these third-party gambling site can and do cheat CS:GO players betting skins.  An anonymous Valve employee told a reporter that "I don't think the rigged roulette sites in Russia give two f--ks" about the original lawsuit filed against Valve that mentions third-party websites based overseas.[27]  The full context of that quote:

---

[25] http://steamcommunity.com/groups/tradingcards/discussions/1/622954023422884592/
[26] https://www.reddit.com/r/Steam/comments/3lvvao/how_safe_are_third_party_websites_that_allow_you/;
http://steamcommunity.com/id/drunkenf00l/
[27] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/

13


Our Picks   Popular   Sections

# The Daily Dot

⋮   🔍

> The alleged co-conspirators in the suit, skin
> gambling sites CSGO Lounge, Diamonds, and
> OPSkins, will also likely be unaffected.
>
> Ward acknowledged that even reaching these sites
> would be difficult. "Who are these sites?" he said.
> "We know Lounge is a real business in Poland, but
> for Diamonds, we have no idea ... this can be a
> problem that prevents offshore-gambling suits from
> going forward."
>
> The Valve employee added: "I don't think the rigged
> roulette sites in Russia give two fucks."
>
> Valve did not respond to requests for comment on
> this article.

55.     In addition to anonymous employees bashing lawsuits to reporters and admitting
Valve is aware that rigged third-party sites are taking money from Valve's teenage customers,
Valve has publicly discussed gambling on CS:GO.  For instance, in order to stem the increased
hacking, fraud and other harms to consumers that had arisen out of Skins gambling in 2015,
Valve introduced new security measures.   Valve announced these measures on December 9,
2015, in a post called "Security and Trading" on the Steam marketplace website.[28]

56.     In this post, Valve wrote: "Account theft has been around since Steam began, but
with the introduction of Steam Trading, the problem has increased twenty-fold as the number
one complaint from our users… This was an unacceptable status quo and we needed to address
it. In revisiting our strategy to stop it, we found two things of note. First, enough money now

---

[28] http://store.steampowered.com/news/19618/

14

moves around the system that stealing virtual Steam goods has become a real business for skilled hackers. Second, practically every active Steam account is now involved in the economy, via items or trading cards, with enough value to be worth a hacker's time. Essentially all Steam accounts are now targets."[29]

57.    Valve admitted that it knew Skins had real world cash value: "If hackers couldn't move the stolen goods off the hacked account, then they couldn't sell them for real money, and that would remove the primary incentive to steal the account."[30]

58.    Valve thus knows and has admitted that its in-game Skins have real world value through third-party websites it knowingly supports and assists on the Steam Marketplace.

59.    Valve could have stopped this hacking and theft perpetrated against consumers - again, mostly teenagers - by "removing trading" — but chose not to.  Instead, Valve instituted new two-factor security and an "escrow" system where Valve held onto items for a short period of time before delivery between users' accounts and third-party bot or trading accounts.[31]

60.    Valve is aware that users get scammed from gambling bots operating inside the Valve Marketplace, and has a Support Frequently Asked Question to deal with this called "Gambling Bot Trade Offer": "A fake gambling bot tells you that you have won an item jackpot, but in order to receive the items, you must first accept their trade offer. After receiving your items, the user blocks your messages and keeps your items. Tip: Never trade an item away when prompted by another user or bot if you cannot verify their claim."[32]

61.    In the summer of 2015, Valve was notified of potential match-fixing, and worked with a European e-sports league to ban the alleged perpetrators. Valve admitted it could monitor

---

[29] http://store.steampowered.com/news/19618/
[30] http://store.steampowered.com/news/19618/
[31] http://store.steampowered.com/news/19618/
[32] https://support.steampowered.com/kb_article.php?ref=3415-WAFH-6433&l=english

players' accounts for activity consistent with gambling and match-fixing. It also introduced a new rule: "[p]rofessional players, teams and anyone involved in the production of CS:GO events, should under no circumstances gamble on CS:GO matches, associate with high volume CS:GO gamblers, or deliver information to others that might influence their CS:GO bets." [33]

62. On its own website, Valve explained this decision in greater detail, in the screenshot and full text reproduction below, emphasis by Valve in the original[34]:

> We frequently sponsor third-party events to add to their entertainment value for viewers and broaden the audience for competitive CS:GO. To be eligible to participate in a Valve-sponsored event, players are required to follow the rules provided by that event's organizers. In addition to that organizer's rules, we expect that players who plan to participate in any future Valve-sponsored event will hold themselves to a high standard of professional integrity. Professional players, teams, and anyone involved in the production of CS:GO events, should under no circumstances gamble on CS:GO matches, associate with high volume CS:GO gamblers, or deliver information to others that might influence their CS:GO bets. To clarify – as a professional player, team manager or event production staff, it is common to have personal relationships and/or privileged information about other teams and players. **Because of this, we will always assume that you have access to private CS:GO-related "inside information" that might give you an unfair advantage when placing a bet on any CS:GO game or match.** Betting using inside information, or even the perception or suspicion thereof, carries a significant risk of damaging your personal brand, your team, your community, and may lead to exclusion from future Valve-sponsored events. To avoid these risks, we recommend that you never bet on any CS:GO game or match. This recommendation applies both to current professional players and anyone who wishes to participate in a Valve-sponsored CS:GO event in the future. It's important to consider the substantial impact an individual professional Counter-Strike player has on the health and stability of the sport. Performing before an audience of millions of fans, you are ambassadors for your game – the strength of professional Counter-Strike comes from the integrity of its players and teams.

---

[33] http://en.esl-one.com/csgo/katowice-2015/news/update-on-the-offline-qualifier-including-disqualifications-invites-and-more/

[34] http://blog.counter-strike.net/index.php/unnecessary_risks/



63.     Some gambling sites, such as Diamonds, don't even require players to wager on the outcome of eSports matches, and simply operate roulette-style games where people risk Skins to win more Skins based on the roll of the dice or the outcome of random number generators[35]:

---

[35] http://csgodiamonds.com/#/

17



64.     As the above screenshot shows, the STEAM logo is prominently displayed and users must login through STEAM to access and bet their Skins.

65.     Valve employees communicate directly with Lounge and provide technical support to the website, according to a Lounge employee and spokesperson.[36] The Valve logo is displayed prominently on the website and users must login to their Steam account to wager on matches on Lounge[37]:

---

[36] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[37] https://csgolounge.com/

18



66.     In a post on Valve's forum, a moderator — that is, a Valve spokesperson who manages the forums on behalf of Valve — told "younger" users who think they have been scammed through third party sites such as Lounge to not post on the forums about it.  Rather, those "younger" users who were scammed on a third-party gambling site should contact Valve directly.[38]  In this post, the moderator on Steam's own forums told users, including its "younger" users: "Safe betting and trading!"[39]

67.     Despite these connections, Lounge claims on its website that it is not affiliated with Steam or Valve:

---

[38] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[39] http://steamcommunity.com/groups/csgolounge/discussions/8/627456486705186974/

19



68.    The above screenshot shows where users are taken when they attempt to place a bet on a match on Lounge - they must login to their Steam account through Steam/Valve's website.

69.    Lounge acts as a sports book or pool betting system: it takes bets on each side of matches and takes a fee from the transaction, which it then, upon information and belief, shares with Valve.

70.    Finally, once users have accumulated Skins or Knives in their Steam accounts through third-party gambling sites, they can convert them to cash through OPSkins.

20

71.    OPSkins, based in Canada, links directly to a user's Steam account as well[40]:



[40] https://opskins.com/;
https://steamcommunity.com/openid/login?openid.ns=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0&openid.
mode=checkid_setup&openid.return_to=https%3A%2F%2Fopskins.com%2Findex.php&openid.realm=https%3A%
2F%2Fopskins.com&openid.identity=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0%2Fidentifier_select&ope
nid.claimed_id=http%3A%2F%2Fspecs.openid.net%2Fauth%2F2.0%2Fidentifier_select



72.     Users on OPSkins can cash out their Skins for real money through their PayPal

accounts.

73.     CSGOFast allows users to win Skins through different types of raffles by

purchasing a number of tickets associated with the value of the Skin bet by users.



74.     Users must login to Speed through their Steam account:



75.   CSGO Shuffle is a Skins gambling website where users bet skins in order to get raffle tickets which then dispenses the skins to the winner, after Shuffle takes a 5% cut  Users must login through their Steam account:



76.   SkinArena is another raffle and gambling website using Skins that requires users to login through their Steam account:



24

77.     Valve admits that they allow these third-party websites to have authenticated Steam accounts and trade on the Steam marketplace.[41]

78.     Valve has the power to stop these third-party sites from accessing the Steam Marketplace and engaging in gambling transactions, but chooses not to.

79.     Thus, users deposit real money on Valve's website, connect that real money account to nominally third-party websites with direct connections to Valve where users can participate in various forms of gambling, and then cash out their account balances, converting Skins into real money.

80.     Lotto was formed on December 3, 2015, according to its Articles of Incorporation.

81.     Lotto runs a Skins pool betting website that is purely a game of chance.

82.     These Skins can be sold like real money, making Lotto a gambling website.

83.     This is an illegal scheme designed to bypass state-by-state gambling laws.

**C.     How Unregulated Gambling Harms Consumers**

84.     Because Valve has helped to create an unregulated, international gambling concern with no oversight that targets teenagers specifically, Plaintiff and the class have been damaged.

85.     This unregulated market is ripe for scams, cheating, fraud and other harms to users. For instance, there have been numerous instances of match-fixing in CS:GO matches: in January 2015, it became clear that a highly qualified team of CS:GO players fixed matches against lesser teams.[42]

---

[41] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/
[42] http://www.dailydot.com/esports/match-fixing-counter-strike-ibuypower-netcode-guides/

86.     For instance, there are rigged Russian roulette websites, according to Valve.[43]

87.     In 2016, "reports of a particularly high-profile incident reached Valve, and the company contacted CSGO Lounge to help identify the culprits....   In the end, Valve banned seven players from events it sponsors, and forbade professional players and team staff from gambling on matches, associating with high-volume gamblers, or sharing inside information."[44]

88.     In June 2016, Diamonds admitted it was providing a sponsored player with advance notice when he would win spins on its site, so that the user would record himself playing and winning, post this video to YouTube and social media sites, and generate excitement and new users for Diamonds' website.[45]

89.     Martin and Cassell each made multiple YouTube videos purporting to show themselves winning Skins pools.  In these videos, neither Martin or Cassell indicate that they are owners, sponsors or otherwise affiliated with the website.[46]

90.     These websites contain advertisements and inducements to gamble, and include titles such as "How to Win $13,000 in 5 minutes (CS:GO Betting)"[47] and "WINNING BIG $$$$!!! (CS:GO Betting)"[48] and clearly depict Martin and Cassell winning large amounts of real money – not Skins – by gambling on these sites.

91.     These videos have nearly a million total views[49], and Cassell's YouTube channel has more than 9,000,000 subscribers.[50]

---

[43] http://www.dailydot.com/esports/skin-betting-csgo-lawsuit-valve/
[44] http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/
[45] http://www.esportsbettingreport.com/csgo-diamonds-skin-betting-m0e/;
http://www.twitlonger.com/show/n_1sopll1
[46] https://www.youtube.com/watch?v=88oXvWaczoY; *see also* https://www.youtube.com/watch?v=_8fU2QG-lV0&feature=youtu.be (Martin announced on Twitter on July 4, 2016 that he had removed public access to his gambling videos, stating "I privated them for the time being, they are not deleted").
[47] https://www.youtube.com/watch?v=_V-dS74WJTw
[48] https://www.youtube.com/watch?v=-f6OFbaGf9I
[49] https://www.youtube.com/watch?v=_V-dS74WJTw; https://www.youtube.com/watch?v=-f6OFbaGf9I
[50] https://www.youtube.com/channel/UC1ieoHqKW-yYgDhLHIcx28w

92.     These videos show how Martin and Cassell rig their own website to the detriment of CS:GO players, Plaintiff and the Class.

93.     The videos and other related promotions are highly lucrative for Martin and Cassell. For example, in 2013 alone, Martin expected to earn approximately $300,000 in revenue from video game sponsorships and promotions.[51]

94.     These videos show the harm that comes to CS:GO players, Plaintiff and the Class from having unregulated Skins gambling.

95.     The YouTube channel h3h3Productions uncovered details about Martin and Cassell's ownership interest in Lotto, and posted a 13 minute video detailing their deceptions: https://www.youtube.com/watch?v=_8fU2QG-lV0&feature=share.

96.     Martin publicly admitted to the deception in a Twitter post (that Martin later deleted) quoted in a July 5, 2016, Forbes magazine article[52]:

> I've admitted to wishing I was more upfront about owning the site.
> It was always public info but I was never very outspoken about it.
> My idea was to keep business business, while the focus of YouTube
> was simply making entertaining content. Obviously that was
> misleading to viewers and something I very much regret. I've never
> been perfect and I 100% own up to that mistake....That being said,
> everything we've done up until this point has been legal, that
> has been a #1 priority of ours. The day it becomes illegal is
> the day we cease activity.

97.     Plaintiff would not have played on sites such as Lotto if he knew that Lotto was manipulating its product and videos to make it appear as if the people winning were actually winning, and instead were coordinating behind the scenes to misrepresent their websites.

---

[51] Don Dodson, *Champaign Native Turns Gaming Skills into Lucrative YouTube Career*, The News-Gazette of Champaign, Ill,, Jan. 2, 2014, available at http://www.news-gazette.com/news/local/2014-01-02/champaign-native-turns-gaming-skills-lucrative-youtube-career.html.

[52] Paul Tassi, *CS:GO Lotto Controversy Raises Issues About YouTuber Disclosure, Valve's Indifference*, Forbes Tech, July 5, 2016, available at http://www.forbes.com/sites/insertcoin/2016/07/05/cs-go-lotto-controversy-raises-issues-about-youtuber-disclosure-valves-indifference/#5a6ff45a4500

98.     After Martin and Cassell's deception became known, Valve intervened, for a short time.  On July 4, 2016, Valve cut off access to Lotto to the Steam Marketplace after news of Lotto's owners YouTube videos, discussed above, was reported in the news.

99.     The website pcgamesn.com[53] reported that "a message from Valve...warns that [Lotto] has been flagged as 'phishing, scamming, spamming, or delivering malware.'"



100.    Valve still allows users to continue on and bet their Skins on this account even though it says it was blocked for being "engaged in phishing, scamming, spamming, or delivering malware."

101.    The action by Valve to limit access to Lotto definitively proves that Valve, if it wanted to, could cut off access by gambling sites such as Lounge, Diamonds, Lotto, or any other website with Skins gambling.  However, Valve has chosen to continue facilitating gambling within its Steam marketplace.

102.    Valve continues to defraud consumers by not recognizing the gambling ecosystem for what it is, and knowingly telling consumers that Lotto was blocked because of reasons other

---

[53] http://www.pcgamesn.com/counter-strike-global-offensive/csgolotto-csgo-gambling-tmartn-prosyndicate

than that unregulated gambling harms consumers, and Lotto is just the only one to be publicly caught.

103.    Valve knows that there are websites in Russia that have rigged roulette and other casino-style games, yet continues to allow those websites, and websites with other gambling games, to operate within the Steam Marketplace on Valve's servers, even though it has the power, ability, and duty to cut off access like it did to Lotto.

104.    After calling Lotto a potential scam website, Valve reversed course and eliminated the webpage warning, allowing teenagers and the class full access to Lotto from the Valve account.

105.    In explaining this decision, a Valve agent, employee and/or representative with the online screen name "KillahInstinct"[54] told users on Reddit.com that a volunteer for Valve blocked Lotto erroneously.  Specifically, KillahInstinct said that Lotto was added to the "URL blacklist" which is "generally only used for malicious* links and blocks links throughout Steam everywhere and therefor used with extreme caution."  By "malicious", KillahInstinct meant "malware, phishing, scam sites" and noted that "[a]s we all know, there are **a lot** of them out there." (emphasis by KillahInstinct).  That is, Valve is aware that because of the real-world value of Skins, there are **"a lot"** of scam and malicious websites that target the users of CS:GO.

106.    KillahInstinct went on to explain that it was a "mistake" to block Lotto by a fellow volunteer employee of Valve because KillahInstinct was on vacation.  Further, KillahInstinct made it clear that he was "not commenting if [Lotto] is bad, morally wrong, etc. - I am just saying that I haven't seen evidence of that it's malicious in the way that it should be before we add something to a global filter."[55]

---

[54] https://www.reddit.com/r/GlobalOffensive/comments/4r7p0a/csgo_lotto_banned_on_steam/
[55] https://www.reddit.com/r/GlobalOffensive/comments/4r7p0a/csgo_lotto_banned_on_steam/

107.    A user then asked how Valve decides which gambling sites are allowed, and KillahInstinct replied, "Simple, we don't. As I said, we only block malicious sites." [56]

108.    KillahInstinct went on to explain that pure Skins gambling websites like CSGOJackpot.com, CSGoDouble and CSGoShuffle are "legit" and that if one of them is banned it can contact Steam support to remove the ban. That is, a Valve employee discussed gambling websites as "legit" and admitted that Valve's support team can help gambling websites regain access to the Steam marketplace.

109.    For instance, KillahInstinct communicated directly with a reddit user who complained that his website, bitskins.com, which is used for people to cash out their Skins into real money, was blacklisted. In response, KillahInstinct told this person to contact Valve's Steam Support directly to fix this issue. This means that Valve is working directly with companies that cash out Skins for real money to help them access the Steam Marketplace when they lose that access.

110.    KillahInstinct admitted that Valve is allowing the Skins gambling economy to continue and that he does not like how the Skins gambling community has become and that "it's all about profit, but I can hardly fault Valve for that." [57]

111.    KillahInstinct admitted that if they blocked Lotto because its owners were a scam website that rigged the gambling games and made videos of themselves gambling on their own sites, "I think we could end up blocking every gamble (sic) site if that were the case. Having proof of malware/scams of a site is not the same as dodgy business practices." [58]

---

[56] https://www.reddit.com/r/GlobalOffensive/comments/4r7p0a/csgo_lotto_banned_on_steam/
[57] https://www.reddit.com/r/GlobalOffensive/comments/4r7p0a/csgo_lotto_banned_on_steam/d4zx0he
[58] https://www.reddit.com/r/GlobalOffensive/comments/4r7p0a/csgo_lotto_banned_on_steam/

112.   In another post, KillahInstinct said that Valve could disable bot accounts, like those used for effectuating and facilitating gambling, if it chose to.[59]

113.   In sum, Valve has the technical capabilities to block access to any gambling site it chooses to, but has made an affirmative decision to instead work directly with third-party gambling websites to give them access to Valve's computers in order to facilitate their gambling transactions.

**D.   Plaintiff's Specific Allegations**

114.   Plaintiff first played CS:GO and made deposits into his Steam wallet accounts and made bets on third-party websites when he was a teenager, under the age of 21, and therefore unable to legally gamble in most regulated gambling establishments.

115.   The arbitration agreement Valve may seek to enforce is an unenforceable contract for numerous reasons, not limited to the inability of minors to enter into legally binding contracts.

116.   Valve is well aware that their users are teenagers.  Steam's account requires you to check a box indicating you are 13 years of age or older, and does not require you to read the Subscriber Agreement before creating a Steam account[60]:

---

[59] https://www.reddit.com/r/Steam/comments/4r97he/video_series_teaching_how_to_make_steamcommunity/
[60] https://store.steampowered.com/join/?



117.   Plaintiff signed into his Steam account through the third-party websites Lounge, Lotto, CSGOFast, CSGOShuffle, and CSGOJackpot.

118.   Plaintiff, purchased Skins, cases and keys from Valve and paid Valve a fee to do so on numerous occasions since 2013.   He purchased Skins from OPSkins on numerous occasions.

119.   Plaintiff was aware Skins had real world value and could be cashed out on sites such as OPSkins.

120.   Plaintiff's used those Skins to place bets on Lotto, Lounge, Fast, Shuffle, and Jackpot through trading Skins to each via his Steam accounts, hosted and facilitated by Valve, and lost Skins, and therefore the real world cash value of these Skins, in these transactions.

32

Overall, Plaintiff lost thousands of dollars on unregulated third-party betting websites on both matches and casino-style websites.

## CLASS ALLEGATIONS

121.  A class action is the proper form to bring Plaintiff's claims under FRCP 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

122.  This action satisfies all of the requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

123.  **Numerosity**: the Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. News accounts discuss how millions of users compete on the websites of Defendant and its unnamed co-conspirators.

124.  **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

    a.  Whether Plaintiff and members of the Class entered into contracts with Defendant over the past four years;

    b.  Whether such contracts are *per se* void, pursuant to New Jersey law;

    c.  Whether such contracts are void pursuant to New Jersey civil law;

    d.  Whether the Terms of Use are unconscionable, illusory, fraudulent, or otherwise invalid;

    e.  Whether Plaintiff and members of the Class paid monies to Defendant in consideration of those contracts;

    f.  Whether Defendant's operations and third-party websites including Lotto that Valve supports are a game of chance under all applicable laws and rules;

g.   Whether the operations of Valve and Lotto violate New Jersey law;
h.   Whether Plaintiff and members of the Class are entitled to restitution and entitled to recovery of lost wagers from Valve or the disgorgement of profits from Valve's profits in illegal gambling;
i.   Whether Defendants acted in concert with other CSGO gambling sites to condone, allow, or promote the practice of betting and gambling through the use of CSGO items;
j.   Whether Defendants were negligent or otherwise acted wrongfully in allowing and encouraging users to utilize its service to bet and gamble on CSGO games;
k.   Whether Defendants owed duties to the Plaintiff and the proposed Class members, the scope of those duties, and if they breached those duties;
l.   Whether consumers such as the Plaintiff and the proposed Class members were harmed by Defendants' actions, as described in detail above;
m.   The extent of the damages caused by the Defendant's acts; and
n.   Whether Defendants violated New Jersey state consumer protection statutes, as well as the consumer protection statutes of other states.

125.   **Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, was induced to use Defendants' sites based on false and misleading advertisements of fair play, and lack of information about having to compete against players with inside information.

126.   The claims of the Class Representative Plaintiff are furthermore typical of other Class members because they make the same claims as other class members. Plaintiff has an interest in seeking compensation from Defendants.

127.   **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class members.

128.   **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a

large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

129.    The nature of this action and the nature of New Jersey and federal laws available to Plaintiff and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

130.    The proposed Class is described as follows:

**"All persons in the United States whose money was used to purchase Skins in any account with Defendants and/or their unnamed co-conspirators"**

131.    Plaintiff further proposes a Subclass ("the New Jersey Subclass") defined as:

**"All persons in New Jersey who, since July 6, 2010 have been shown or entered into Subscriber agreements with Valve**

35

**and/or Lotto, the same or substantially similar to the ones currently applicable to all members."**

132.   Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

133.   Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

134.   The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

135.   Excluded from the Class are:
   a.   Defendants and any entities in which Defendants have a controlling interest;
   b.   Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants;
   c.   The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;
   d.   All persons or entities that properly execute and timely file a request for exclusion from the Class;
   e.   Any attorneys representing the Plaintiff or the Class.

## COUNT I
## RESTITUTION PURSUANT TO NEW JERSEY STATUTE SECTION 2A:40-1, et seq.

136.   Plaintiff, on behalf of HIMSELF and the proposed Class, repeats and realleges all preceding paragraphs as if fully set forth herein.

137.   New Jersey Statute Section 2A:40-1, et seq., defines gambling transaction in a manner that encompasses the activities by Valve, OPSkins and Skins Gambling Websites.

138.    Section 2A:40-1 renders all contracts for gambling unlawful.

139.    Plaintiff and members of the Class entered into contracts with Lotto, Lounge, OPSkins, and other Skins Gambling Websites that are unlawful, and thus void. Specifically, Plaintiff created a Steam account in 2012 and entered into transactions with Valve in which he purchased Skins on numerous occasions over a period of approximately 3 years. He then gambled the Skins, including on Lotto, frequently betting Skins worth $10-30 each and losing their equivalent cash value.

140.    Plaintiff purchased and gambled Skins.

141.    Plaintiff and members of the Class paid monies in consideration of these contracts that are void.

142.    Accordingly, Plaintiff and members of the Class are entitled to damages in the form of restitution for monies bet in connection with these void and illegally enforced contracts over the course of the past four (4) years.  As a facilitator of these contracts, Valve is responsible for their illegal enforcement and damages therefrom.

## COUNT II
## UNJUST ENRICHMENT

143.    Plaintiff, on behalf of himself and the proposed Class, repeats and realleges all proceeding paragraphs as if fully set forth herein.

144.    Plaintiff and members of the proposed Class conferred a benefit on Defendants by purchasing CS:GO, depositing money, purchasing in-game items, and playing in contests on various websites with which Valve had a financial relationship.

145.    Defendants have further benefited monetarily from unlawful and/or illegal conduct directed to its customers in New Jersey, including from Plaintiff and members of the class.

146.   Defendants' benefit came at the expense and detriment of Plaintiff and Class members.

147.   Defendants have thus unjustly enriched themselves in retaining the revenues derived from enforcement of illegal contracts, deposits, wagers, purchases and gambling by Plaintiff and the members of the proposed class, which retention under these circumstances is unjust and inequitable because Defendants entered into or caused to be created illegal, voidable, and unconscionable gambling contracts with Plaintiff and other members of the proposed class, and has created an illegal international gambling economy operating in the United States and targeted at teenagers.

148.   Defendants have benefited from the creation of an illegal gambling scheme through the creation of Skins and the assistance provided to domestic and international companies that provide ways to gamble Skins and convert in-game Skins with no cash value into cash value. Defendant Valve has also benefited from the creation of an illegal gambling market by inflating the value of Skins, something with no intrinsic value, which it then sells for a fee. Valve has also benefited from the increased sales, increased exposure, marketing revenue, sponsorship revenue and other financial benefits that CS:GO has brought Valve because of its popularity, which is due almost entirely to Skins gambling.

149.   Plaintiff and members of the proposed class were injured as a direct and proximate result of Defendants' illegal activities because they paid for items and wagers that were unregulated, illegal gambling activities ripe for fraud, abuse and theft, and with no way of knowing whether they were fairly run.

150.   Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and the members of the proposed class is unjust and inequitable, Defendants must pay

restitution to Plaintiff and the members of the proposed class for their unjust enrichment, as ordered by the Court.

151.    Equity and good conscience require that Defendants disgorge any profits made thereby, and Plaintiff and members of the class further seek restitution on this basis.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962

152.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

153.    The Skins Gambling Websites, Valve, and OPSkins are all "persons" under 18 U.S.C. § 1961(3).

154.    Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OPSkins's illegal gambling businesses involve five or more persons who conduct, finance, manage, supervise, direct and/or own all or part of Valve, Lotto, the Skins Gambling Sites, and OPSkins, within the meaning of 18 U.S.C. § 1955.

155.    Pursuant to 18 U.S.C. § 1962:

It shall be unlawful for any person who has received any income derived, directly or indirectly, form a pattern of racketeering activity or through collection of an unlawful debt... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

156.    Valve, Lotto, Martin, Cassell and the other non-defendant third-parties identified above in Paragraph 5 named in this count violated 18 U.S.C. § 1962(c) by participating in, facilitating, or conducting the affairs of the Valve, Lounge, OPSkins and/or Diamonds RICO Enterprise through a pattern of racketeering activity.

157.    Valve, Lotto, Martin, Cassell, OPSkins, and the Skins Gambling Websites are operating illegal online gambling websites within New Jersey. Skins Gambling Websites and OPSkins all depend on Valve to operate their businesses to facilitate gambling, trades of items, as well as item sales. These entities also rely on a third-party market, like the one hosted by OPSkins and other websites, in order to provide a way for gamblers to cash out their in-game items for cash value, to process these payments, and to set the real world valuation for these items.

158.    Skins Gambling Websites, Lotto, OPSkins and Valve are the ringleaders of their respective illegal gambling enterprises, as set forth herein. Martin and Cassell are specifically the ringleaders at Lotto.

159.    Independently and collectively, Valve, Lotto, Martin, and Cassell are responsible for facilitating the growth of the illegal internet gambling enterprises, such as those operated by Skins Gambling Websites and OPSkins, that blossomed into billion dollar business because they created and provided legitimacy and support for what is, in fact, an illegal gambling activity.

160.    Valve provided money, technical support, and advice for Lotto and other Skins Gambling Websites, and for OPSkins, providing legitimacy to the illegal gambling that was occurring, and continues to occur, and by permitting Skins Gambling Websites and OPSkins to use their logo and infrastructure to attract more bettors.

161.    Plaintiff placed bets on multiple contests through Lotto and other Skins Gambling Websites. The wagers allow these sites to operate and profit. The bets were facilitated by Valve, and Valve permits users to buy and sell the winnings of such bets on OPSkins.

162.    Valve has a direct interest in the operation of OPSkins, Lotto and Skins Gambling Websites because Valve profits directly and indirectly through the online gambling websites.

163.    Valve's processing of transactions facilitated by Lotto, other Skins Gambling Websites, and OPSkins' illegal gambling scheme, implicates Valve and Lotto by directing, conducting, guiding, and participating, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity and/or collection of an unlawful debt.

164.    As a result of Defendants' actions, Plaintiff has suffered financial losses.

165.    Plaintiff and class members are "person[s] injured in his or her business or property" by reason of Lotto's, Skins Gambling Websites' and OPSkins's and Valve's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

166.    The acts alleged herein occurred more than three times and on a daily bases.

167.    Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to recover treble damages, costs and attorneys' fees for his damages proximately caused by Defendants' RICO enterprise.

**A.      Predicate Act – Violation of 18 U.S.C. § 1955**

168.    Independently and collectively, Valve, Lotto, Martin, Cassell, and the unnamed co-conspirators in this Count are responsible for the growth of the illegal enterprise to become a multi-billion dollar business by providing legitimacy to what was, in fact, an illegal activity. The mere act of allowing Plaintiff, and other members of the Class, to sign into Steam through Skins Gambling Websites and OPSkins bolstered the credibility of the illegal enterprises in the eyes of unsuspecting bettors.

169.    Valve, Lotto, Martin, Cassell, and the unnamed co-conspirators all committed a Predicate Act under RICO, violation 18 U.S.C. § 1955, which provides in relevant part:

> (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
> (b) As used in this section—
>      i. "Illegal gambling business" means a gambling business which—is a violation of the law of a State or political subdivision in which it is conducted; involves

41

five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

**

(4) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

**

(6) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

170. Valve, Lotto, Martin, Cassell, Skins Gambling Websites and OPSkins are illegal gambling businesses because they meet all three elements of 18 U.S.C. § 1955(b)(1-3).

171. Valve, Lotto, Martin, Cassell, Skins Gambling Websites and OPSkins are each "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(1), because, as set forth herein, each of their activities violate all state laws and at a minimum, New Jersey. "State" means any State of the United States. 18 U.S.C. § 1955(b)(6).

172. Valve, Lotto, Martin, Cassell, Skins Gambling Websites and OPSkins are each an "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(2), because each respective business involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of the business.

173. Valve, Lotto, Martin, Cassell, Skins Gambling Websites and OPSkins are each an "illegal gambling business" within the meaning of 18 U.S.C. § 1955(b)(3), because each have been or remain in substantially continuous operation since at least January 1, 2013, for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

## B. The Online Gambling RICO Enterprises

174. The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO,:

175.   **Skins Gambling Websites**, who: 1) created an illegal gambling enterprise; 2) knowingly created and conducted illegal gambling activities in violation of all state laws and at a minimum, New Jersey in return for payment of items of value, including significant sums of money; 3) conducted, directed, managed, supervised, directed and owned an illegal gambling business in violation of 18 U.S.C. § 1955.

176.   **Valve**, who: 1) knowingly facilitated the transactions required to conduct the illegal gambling operations of Lotto, as well as CSGO Lounge and CSGO Diamonds; 2) provided technical support and know-how to Lotto, CSGO Lounge and CSGO Diamonds to permit them to link their own database of users with Steam users. By virtue of this support, implicit promotion and endorsement of Defendant's illegal internet gambling enterprises, Valve thereby gave credibility and legitimacy to these defendants and thus attracted more players to participate as customers in an illegal gambling enterprise.

177.   **OPSkins**, who: 1) knowingly facilitated transactions of users buying, selling, and general cashing-out of items users gained through participation on Skins Gambling Websites illegal gambling enterprises. This support entices and attracts users of all ages to participate on defendants gambling websites so that they might win more valuable items in the hopes of being able to turn an in-game currency into real money.

178.   **Skins Gambling Websites**, each of which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. Each RICO enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

179.    Valve, Skins Gambling Websites and OpSkins each participated in the RICO enterprise, but also had an existence separate and distinct from the enterprise.

180.    At all relevant times, Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins operated, controlled, or managed their respective CSGO gambling services through a variety of actions.

181.    Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins participation in the RICO enterprise was necessary for the successful operation of its scheme to conduct an illegal gambling enterprise, both companies controlled and monitored all aspects of eGaming betting and gambling on its respective website and concealed the nature and scope of the illegal gambling enterprise and profited from such concealment.

182.    The members of the gambling enterprise served a common purpose: to maximize profits on their respective illegal gambling sites and to collect as many rare in-games item as possible in order to profit from the resale of these items on the third-party market through the use of user fees and bets.

**C.    The Pattern of Racketeering Activity**

183.    Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins conducted and participated in the conduct and the affairs of their respective Online Gambling Enterprises through a pattern of illegal internet gambling pursuant to violations of 18 U.S.C. §1955 thereby constituting racketeering activity that has lasted for several years beginning no later than January 1 2013 and continuing to this day, and that consisted of numerous and repeated violations of 18 U.S.C. §1955, mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

184.   The purpose of Valve, Lotto, Skins Gambling Websites, and OpSkins and the scheme to violate 18 U.S.C. § 1955 was to profit through illegal internet gambling.

185.   By concealing the scope and nature of each illegal gambling enterprise, Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins also maintained and boosted consumer confidence in their respective illegal internet gambling enterprises, their brands, and e-sports betting, all of which furthered their schemes to defraud and helped both Valve, Lotto, Skins Gambling Websites, and OpSkins generate more users to play their bet and gamble on their respective sites.

186.   As detailed in this Complaint, Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins were well aware that its enterprise constituted illegal internet gambling under federal and individual United States law. Nonetheless, they used money generated from innocent bettors to intentionally subject Plaintiff and Class Members to those risks or consciously disregarded those risks in order to maximize their profits at the expense of Plaintiffs and Class Members.

187.   To carry out, or attempt to carry out the scheme to defraud, Valve, Lotto, Martin, Cassell, Lounge, OpSkins and Diamonds each individually conducted or participated in the conduct of the affairs of their respective RICO Enterprises through the following pattern of racketeering activity that violated 18 U.S.C. § 1955 and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

   a.   Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins devised and furthered their own schemes to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, user fees and illegal

gambling proceeds, writing(s) and/or signal(s), including their respective websites, statements to the press, and communications with other members of their respective RICO Enterprises, as well as the user fees and transactional costs of the illegal internet gambling activities, advertisements and other communications to the Plaintiffs and Class Members; and

b. Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins each individually utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

188. The Defendants' separate pattern of racketeering activity in violation of 18 U.S.C. § 1955 and the use of the mail and wire fraud statutes included but was not limited to the following:

a. Knowingly conducting illegal gambling activities that violated, at a minimum, the laws of the state of New Jersey and thereby also violating 18 U.S.C. §1955, a RICO predicate act;

b. By transmitting, causing to be transmitted, by means of mail and wire communication and the internet, by travelling in interstate or foreign commerce, between their offices in Washington and various other locations across the United States, communications concealing the illegality of their schemes on their betting websites on a nationwide basis.

189. The conduct of Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins in furtherance of their respective illegal activities and gaming was intentional. Plaintiff and Class members were directly harmed as a result of Defendants' conduct.

190.    As set forth herein Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins engaged in patterns of related and continuous predicate acts since at least August 1, 2013. The predicate acts constituted a variety of unlawful activities with each conducted with the common goal of defrauding Plaintiff and other Class members and obtaining significant monies and revenues from them while providing an illegal betting website. These predicate acts were related and not isolated events. Further, the predicate acts also had the same or similar results, participants, victims, and methods of commission.

191.    Because of Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to the loss of their items, wagers, and fees lost when wagering and betting.

192.    The violations by Valve, Lotto, Martin, Cassell, Skins Gambling Websites and OpSkins of 18 U.S.C. § 1955 and 18 U.S.C.§ 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class members in the form of their losses while betting on defendants' illegal gambling websites. As such, Plaintiff and Class members are entitled to bring this class action for three times their actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

193.    As a result of the actions of Valve, Lotto, Martin, Cassell, Skins Gambling Websites and OpSkins, Plaintiff has suffered losses in an amount to be determined at trial.

## COUNT IV
## VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT ("NJCFA"), N.J. STAT. ANN. § 56:8-1, *et seq.*

194.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

47

195.    At all times relevant hereto, the NJCFA was in full force and effect.  N.J. Stat. Ann. § 56:8-1 provides that:

> "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale . . . of any merchandise . . . is declared to be an unlawful practice."

196.    At all relevant times hereto, the Defendants were prohibited by NJCFA from engaging in unfair deceptive acts or practices in the conduct of their business in the State of New Jersey. The actions of the Defendant constitute a violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, et seq., in that such actions were immoral, unethical, oppressive, unscrupulous, offend public policy, and caused substantial injury to consumers, including Plaintiff and Class members, and were done with reckless indifference to the rights of the Plaintiff and New Jersey Class members.

197.    The actions of the Defendants as described in this complaint caused the Plaintiff and class members to suffer actual and ascertainable injuries, damages, loss of money and property.

198.    The above-described deceptive and unfair acts offend public policy and cause substantial injury to consumers.

199.    As a direct and proximate result of the foregoing, the Plaintiff and the New Jersey Sub-Class members have been damaged in an amount to be determined at trial, including compensatory damages and other miscellaneous incidental and consequential damages.

200.    Plaintiff and the New Jersey Sub-Class members seek damages, threefold damages pursuant to N.J.S.A. 56:8-19, , appropriate punitive damages, attorneys' fees, and costs

of suit pursuant to the NJCFA as well as any equitable relief to enjoin Defendant from engaging in the wrongdoing described herein.

## COUNT V
## VIOLATION OF N.J. Stat. Ann. §2C:41-1, et. seq.

201.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

202.    N.J.S.A. 2C:41-2 provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt...to use or invest, directly or indirectly, any interest in, or the establishment or operation of any enterprise which is engaged in or the activities of which affect trade or commerce...

> It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

203.    N.J.S.A. 2C:41-1 defines "racketeering activity" as including "gambling" (N.J.S.A. 2C:41-1(a)(1)(c)) and violations of "sections 112 though 116 inclusive of the "Casino Control Act." [N.J.S.A. 5:12-112 through N.J.S.A. 5:12-116] (N.J.S.A. 2C:41-1(a)(1)(t)).

204.    N.J.S.A. 2C:41-1 further defines an "unlawful debt" as a debt "[w]hich was incurred or contracted in gambling activity which was in violation of the law of the United States, a state or political subdivision thereof..." N.J.S.A. 2C:41-1(e).

205.    Gambling Offenses are defined under New Jersey Law at N.J.S.A. 2C:37-1, et seq.

206.    The crime of Promoting Gambling activity is defined as knowingly accepting or receiving:

money or other property, pursuant to an agreement or understanding with any person whereby he participates or will participate in the proceeds of gambling activity; or [e]ngages in conduct , which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation.

N.J.S.A. 2C:37-2.

207.    As aforesaid, Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins did engage in the creation of a forum for gambling on games as well as the facilitation of accepting money, turning that money into what amount to gambling tokens in the form of skins, and the exchange of those funds between winners and losers of bets made online. As such, Defendants did engage in the crime of promoting gambling activity in violation of N.J.S.A. 2C:37-2.

208.    N.J.S.A. 5:12-112 provides: "Any person who violates the provisions of section 80 or 82 [c.5:12-80 or 5:12-82]...is guilty of a crime in the fourth degree.

209.    N.J.S.A. 5:12-82 requires a licensed issued by the State of New Jersey to operate a casino, and such license is required in order to open internet gaming to the public (N.J.S.A. 5:12-95.21).

210.    Upon information and belief, Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins did not have a license to operate a casino issued by the State of New Jersey.

211.    Despite not having a license issued by the State of New Jersey, Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins did engage in a cooperative effort to

offer internet gaming to the public.

212.    As a result of Valve, Lotto, Martin, Cassell, Skins Gambling Websites, and OpSkins violation of New Jersey law, Plaintiff and the Class are entitled to threefold damages, attorneys fees, costs of investigation, costs of litigation and assessment of civil penalties against Defendants pursuant to N.J.S.A. 2C:41-4(c).

**COUNT V**
**VIOLATION OF THE NEW JERSEY TRUTH IN CONSUMER CONTRACT,**
**WARRANTY AND NOTICE ACT ("TCCWNA"), N.J.S.A. 56:12-16**

213.    N.J.S.A. 56:12-16, in relevant part provides "No consumer contract, notice or sign shall state that any of its provisions is or may be void, unenforceable or inapplicable in some jurisdictions without specifying which provisions are or are not void, unenforceable or inapplicable within the State of New Jersey".

214.    As aforesaid, Defendant, Valve displays, offers and enters into "Subscriber Agreements"[61] with consumers.

215.    Paragraph 7 of Defendant's Subscriber agreement provides in relevant part:

> THIS SECTION DOES NOT REDUCE YOUR MANDATORY CONSUMER RIGHTS UNDER THE LAWS OF YOUR LOCAL JURISDICTION. IN PARTICULAR, SECTIONS 7.A, B, AND C DO NOT APPLY TO EU SUBSCRIBERS.
>
> FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

---

[61]   Defendant's current subscriber agreement is available at:
http://store.steampowered.com/subscriber_agreement/ (last accessed July 5, 2016)

216.    Valve's subscriber agreement further provides, at paragraph 7B, entitled "LIMITATION OF LIABILITY":

> BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, VALVE EU, THEIR LICENSORS, AND THEIR AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

217.    Valve's subscriber agreement violates N.J.S.A. 56:12-16 with each of the quoted provisions by failing to specify which provisions of the agreement are or are not void or unenforceable or inapplicable within the State of New Jersey.

218.    Lotto also has displays, offers, and enters into "Terms of Use" [62] with consumers using its website that violates N.J.S.A. 56:12-16 by failing to specify which provisions of the notice are or are not void or unenforceable or inapplicable within the State of New Jersey, as follows:

   a.    The "Disclaimer of Warranties" clause provides "THE FOREGOING DOES NOT AFFECT ANY LIABILITY WHICH CANNOT BE EXCLUDED OR LIMITED UNDER APPLICABLE LAW."

   b.    The "Limitation of Liability" clause provides "THE FOREGOING DOES NOT AFFECT ANY LIABILITY WHICH CANNOT BE EXCLUDED OR LIMITED UNDER APPLICABLE LAW."

219.    As a result of Defendant Valve's and Lotto's violation of N.J.S.A. 56:12-16, Plaintiff and all New Jersey Subclass members are entitled to a civil penalty of "not less than $100.00 or for or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs." N.J.S.A. 56:12-17

### COUNT VI
### VIOLATION OF THE NEW JERSEY TRUTH IN CONSUMER CONTRACT, WARRANTY AND NOTICE ACT ("TCCWNA"), N.J.S.A. 56:12-15

---

[62] Lotto's Consumer Terms of Use and Notice are available at https://csgolotto.com/terms-of-use.

220.    The TCCWNA provides in relevant part as follows:

> No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed. Consumer means any individual who buys, leases, borrows, or bails any money, property or service which is primarily for personal, family or household purposes.

N.J.S.A. 56:12-15.

221.    The TCCWNA was designed to prevent merchants from imposing on New Jersey consumers contract provisions whose mere inclusion in a consumer contract would violate the rights of consumers and deceive them into thinking such illegal provisions were valid, and thereby, they would not even try to enforce their rights:

> Far too many consumer contracts, warranties, notices and signs, contain provisions which clearly violate the rights of consumers. Even though these provisions are legally invalid or unenforceable, their very inclusion in a contract, warranty, notice or sign deceives a consumer into thinking that they are enforceable and for this reason the consumer often fails to enforce his rights.

*See* Sponsor's Statement, Statement to Assembly Bill No. 1660 (May 1, 1980).

222.    Section 7B of the Subscriber agreement provides:

> TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, VALVE EU, THEIR LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S OR VALVE EU'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING

53

OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S, VALVE EU'S OR THEIR AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S OR VALVE EU'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

223.   Said Agreement violates the clearly established legal rights to pursue claims under the NJ CFA and TCCWNA, and the rights of successful plaintiffs to punitive damages under those acts, in the form of treble damages and/or a civil penalty.   It further purports to violate the clearly established legal rights of consumers to maintain suits for negligence, intentional harms inflicted by Defendants, breach of warranty, and/or strict liability.

224.   Lotto's published Terms of Use, similarly violate N.J.S.A. 56:12-15 by providing:

a. Limitation on Liability
IN NO EVENT WILL THE COMPANY, ITS AFFILIATES OR THEIR LICENSORS, SERVICE PROVIDERS, EMPLOYEES, AGENTS, OFFICERS OR DIRECTORS BE LIABLE FOR DAMAGES OF ANY KIND, UNDER ANY LEGAL THEORY, ARISING OUT OF OR IN CONNECTION WITH YOUR USE, OR INABILITY TO USE, THE WEBSITE, ANY WEBSITES LINKED TO IT, ANY CONTENT ON THE WEBSITE OR SUCH OTHER WEBSITES OR ANY SERVICES OR ITEMS OBTAINED THROUGH THE WEBSITE OR SUCH OTHER WEBSITES, INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO, PERSONAL INJURY, PAIN AND SUFFERING, EMOTIONAL DISTRESS, LOSS OF REVENUE, LOSS OF PROFITS, LOSS OF BUSINESS OR ANTICIPATED SAVINGS, LOSS OF USE, LOSS OF GOODWILL, LOSS OF DATA, AND WHETHER CAUSED BY TORT (INCLUDING NEGLIGENCE), BREACH OF CONTRACT OR OTHERWISE, EVEN IF FORESEEABLE.

b. Indemnification

> You agree to defend, indemnify and hold harmless the Company, its affiliates, licensors and service providers, and its and their respective officers, directors, employees, contractors, agents, licensors, suppliers, successors and assigns from and against any claims, liabilities, damages, judgments, awards, losses, costs, expenses or fees (including reasonable attorneys' fees) arising out of or relating to your violation of these Terms of Use or your use of the Website, including, but not limited to, your User Contributions, any use of the Website's content, services and products other than as expressly authorized in these Terms of use or your use of any information obtained from the Website.

225.    The Terms of Use utilized by Lotto violate the clearly established legal rights to pursue claims under the NJ CFA and TCCWNA, and the rights of successful plaintiffs to punitive damages under those acts, in the form of treble damages and/or a civil penalty.   It further purports to violate the clearly established legal rights of consumers to maintain suits for personal injury, pain and suffering, emotional distress, loss of revenue, loss of profits, etc., regardless of the cause of the injury, whether by Lotto's negligence, breach of contract, "or otherwise", which would include intentional harms inflicted by Defendants as well as those injuries caused by Lotto's reckless or grossly negligent conduct.

226.    As a result of the violations by Valve and Lotto of N.J.S.A. 56:12-15, Plaintiff and New Jersey Subclass members are entitled to a civil penalty of "not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable attorney's fees and court costs."

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment against Defendants, as follows:

a.    For an order certifying the proposed classes, appointing Plaintiff and their counsel to represent the proposed class and notice to the proposed classes to be paid by Defendants;

55

b.    For damages suffered by Plaintiff and members of the proposed class;

c.    For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Defendants;

d.    For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.    An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendants' past conduct;

f.    For Plaintiff's reasonable attorneys' fees, as permitted by law;

g.    For Plaintiff's costs incurred;

h.    For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded;

i.    For a civil penalty of not less than $100 and/or actual damages or both, for New Jersey Subclass members; and

j.    For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all counts so triable.

## NOTICE TO ATTORNEY GENERAL OF ACTION

A copy of this Class Action Complaint shall be mailed to the Attorney General of the State of New Jersey within ten days after the filing of this Class Action Complaint with the Court pursuant to N.J.S.A. 56:8-20.

**LOCKS LAW FIRM, LLC**

Dated: <u>July 7, 2016</u>          By:          <u>/s James A. Barry</u>

Michael A. Galpern
Andrew P. Bell
Alfred M. Anthony
James A. Barry
801 N. Kings Highway
Cherry Hill, NJ 08034
Tel: (856)663-8200
Fax: (856)661-8400
mgalpern@lockslaw.com
abell@lockslaw.com
aanthony@lockslaw.com
jbarry@lockslaw.com

Paul C. Whalen (PW1300)
LAW OFFICE OF PAUL C. WHALEN, P.C.
768 Plandome Rd.
Manhasset, NY 11030
Tel. (516) 426-6870
Fax. (212) 658-9685
pcwhalen@gmail.com

Jasper D. Ward IV
Alex C. Davis
Patrick Walsh
JONES WARD PLC
Marion E. Taylor Building
312 S. Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Tel. (502) 882-6000
Fax (502) 587-2007
jasper@jonesward.com
alex@jonesward.com
patrick@jonesward.com

*Counsel for Plaintiff and the Proposed Class*